Mr. Lillie. Andrew Lillie Morning, Your Honors. May it please the Court. I'm here this morning on behalf of Plaintiff Below and Appellant Mark James. My name is Andrew Lillie, and co-counsel David A. Stryker is here as well. First of all, we appreciate the opportunity for oral argument. This is a very record-bound sort of appeal, and Your Honors know the law, obviously. And so please don't hesitate to jump in. I'm going to tend to— I'm going to tend to whine in this case, as you read my brief, so I apologize in advance. The context here is really important. This is an important case. It's a case that needs to be tried. Obviously we feel that way. We lost on summary judgment below. Mark James, almost 10 years ago, was arrested. You guys know these facts for the most part. Please don't call us you guys. I'm sorry. I'm sorry, Your Honors. The only thing, though, that Mark James was guilty—and a jury of his peers found this after being out for about 30 minutes—was that he was guilty of having married into a custody dispute. I'll get away from themes and try and get into where I think the district— Let's get into facts. I'm sorry? Facts. Facts. The district court erred in four chief areas. One, they didn't draw any of the types of inferences they were required to draw in the non-movement's favor on summary judgment. At every turn, they appear to have taken as sort of record fact newly concocted evidence. Evidence that was concocted, or at least explanations that were concocted in 2013 when Mark James was being prosecuted. And then even more recently, affidavits confected in this very case. We were— If it went to trial, of course, you'd put on Tracy to say that she later regretted having participated in the circumstances that led to the arrest, right? I don't think Tracy would say—she would not hesitate at all. She doesn't regret what she did. The decision that Tracy James made was the correct one. She took her child out of—she didn't have a— Right. I'm sorry. I don't mean it quite that way. But, I mean, at his criminal trial, didn't she testify that she thought Woods and Welburn had put this up deliberately to gain custody of the kids? Absolutely, Your Honor. Right. So you would be using the 2013 testimony. Actually, more contemporaneous. It didn't take until 2013 for Tracy James to figure out what was going on. As you can see, when these folks went to counseling, for instance, Sam, the defendant, and Tracy, his ex-wife and the mother of AGW—and I'm going to refer to AGW—I'm going to try to refer to AGW by those initials. She questioned him for the first time. You've known about this for months, supposedly. You've known what is going on here. And you had no explanation whatsoever. Years later, it becomes this escalation theory. Oh, here's why they're— Well, I'll tell you what—two things I'm concerned about, because all this back and forth about the facts is pretty complicated. But one is, we have the hospital record here, and we're trying to interpret it, and all it says is medical history of gynecological trauma and history of urinary tract infection in the past. Well, medical history is not a diagnosis. Sure. And I can't—I'm not really sure that I see a diagnosis in the record here that I can understand. Maybe that's one. Oh, okay, Your Honor. What you're asking is our theory that there was sort of a falsified approach toward medical evidence that, hey, this little girl had this onset of sex abuse-related symptoms at some point. And our position—is that what Your Honor is speaking of? Yes. Okay, that's an exam from Jackson, Mississippi that she submitted to after this all sort of started. Right. The records that we're referring to are the Pearl River Pediatrics. And I think one of the sort of highlighting moments here is— Do you have a record site? —at 90 record. And these are because so many things were filed under seal. Well, now, that's because Wellborn, according to you, misled the police or whoever about the fact that she had had urinary problems and bedwetting problems in the past. Right? Actually, what she said was that it started when she started living with Mark. And we actually have evidence that— That it predated that. Absolutely, Your Honor. Can you give me the record site you were about to give me? Sorry. It's 93, which is the record document 93. And I think the sort of best distilled version is 93-23, which is a February 10, 2010 letter from Mark. So it's document 93 on page 23? Document 93, and there's the 23rd exhibit, basically. That was our opposition to motion for summary judgment. Okay. And you're saying this is in the sealed part? It is. Okay. And what that was was that was sort of two years in, Mark James, defense attorney, says, hey, look, here are four instances where she's diagnosed with chronic enuresis. And this predates Mark James. That's bedwetting, right? Exactly. Exactly. Sorry. Sorry, Your Honor. But the point being that he put this in front of the DA and said, look, these problems, part of what this whole thing, you know, sort of Tracy comes and says, I will show you medical evidence that around the time that she started living with Mark James that she had physical manifestations, in addition to Mark James fessed up to this. And the gist, the St. Tammany Parish gist, it's really damning, we find. And the district judge sort of disregarded it, said, hey, that's hearsay evidence. You can't rely on that. Okay. But I want to get back to what you were fixing to say about Tracy's lack of regret about her original reaction to the whole situation, which was, I've got a kid who is claiming abuse, I've got to pick her up and I've got to get her out of the situation. Why doesn't that then basically satisfy the Louisiana statute? Because that's exactly what we want. I mean, kids can make things up, kids can be telling the truth, and the truth can be somewhere in between those two things. But, boy, if you're going to err, it's on the side of caution. In fact, you're criticizing the Woods group for not acting fast enough. And so why doesn't that then just satisfy the Louisiana statute that, you know, this kid still to this day, as I understand it, is making the allegation. She hasn't backed off of it. And so the fact that that didn't satisfy a jury beyond a reasonable doubt doesn't mean it's not true. Your Honor, in terms of the whole probable cause concept, our entire theory of the case is that that summer tells the story. And that is, we know, because little A.G.W., as an 8-year-old, tells us, I told my mother, and she's asked four different ways. The counselor, the CAC counselor, which I believe is a record 93, it's Exhibit J. It was obviously filed separately. You see during that video, you see she's asked three, four different ways. When was this? How many times? And she repeatedly says, I told my parents, it was before school was over, and it's one thing. They asked over and over again. Well, was there anything else that happened along the way? But still, doesn't that satisfy Article 611? Isn't that enough? The fact that she today, as I understand it, is still saying the same thing, and it was inappropriate touching, if you believe her. And isn't that enough? And isn't that exactly the point of 611, is to encourage people to make reports and whatever, and then the chips fall where they fell? And ultimately, he was found not guilty, and that's the process in motion. But again, a not guilty verdict is not the same thing as a finding of innocence. You're right, Your Honor. But the probable cause element in a malicious prosecution case requires Sam to have had, at the time that he made the report, some sort of subjective belief, obviously well below, probably beyond reasonable doubt, but something more than mere suspicion. And what that whole summer teaches us is that he shops this little girl around, tells her story. We go to three different mandatory reporters. None of them say, yeah, we need to report this thing. Most of them are kind of like, oh, custody dispute. Next. And so we see in June, May or June, when he finds this out, he takes her. By June 1, Mississippi's CPS had already completed their report. He delivers her back to her supposed abuser all of June, all of July, out of state for July, and then finally, the week before school starts, he has this little girl, sends her to her mom and says, you have something to tell your mom, don't you? That's exactly the heart of our whole case, and that is, is that, well, you're supposed to investigate a little bit, and if he was really worried? We don't get to malicious prosecution, as Judge Haynes says, until we get over the immunity of, that Louisiana law confers. And I think the whole point of that immunity statute is to avoid trials. It's just like we were talking about immunity in the last case. It's to avoid trials. And so you have to have, it seems to me, at least the level of evidence for malicious prosecution to overcome that 611. Well, I think they're sort of interlocking there, and that 611 requires good faith, and obviously bad faith is never presumed, just like malice is never presumed, but the whole concept of probable cause, and a reporter without probable cause will not be in good faith. So I believe that, you know, there's not this sort of threshold. We don't approach this from, can they get past 611? I believe that it is, did they have probable cause? If they have probable cause, that dispels the, you can't have a, we make a. . . I mean, the statute doesn't say that. It says, no cause of action shall exist against any person who, well, dot, dot, dot, person who in good faith makes a report of child abuse. And then the term good faith has been interpreted in other contexts as having a reasonable basis, and why isn't your child saying something happened a reasonable basis? Maybe not perfect. Maybe, again, the jury didn't bleed beyond a reasonable doubt, all of that. That's a very fraught with peril area of the world. But nonetheless, a reasonable basis for, even if Sam also dislikes Mark, okay? I mean, that could also be true, and undoubtedly is. But that, he can still have a reasonable basis because AGW is saying it. So your Honor suggests that a reasonable basis is something that encompasses, it's a little looser than probable cause. Well, I mean, we do have the standard in criminal law of reasonable suspicion, which is less than probable cause. But what I'm saying is, even if you are uncertain, you're the parent. You've got this kid. Maybe it's a kid who has a rich imagination. But then you start to think, oh, my gosh, what if this happened? And I'm going to keep sending her back to this guy. And so eventually you go, I've got to do something, okay? It's still good faith, even if you're not 100% sure what happened, because, of course, you weren't there. This is an 8-year-old kid, you know, whatever. But why isn't that a reasonable basis, that the child says it, and frankly still is saying it even after all the mess that everybody's been through? Well, Your Honor, I think if we viewed that report in sort of a vacuum like that, without all the other attendant circumstances, the prior threats, the falsification of medical records, these types of things, then yes, absolutely. There's nothing that should dissuade a parent from making that type of report, and 6-11 probably does. Without all that other stuff, Sam Woods is in good faith, just like any parent would be. But the other stuff has to be considered as well. Let me bring you back to this report at the Mississippi Medical Center. Does it have a diagnosis? You know, that's real puzzling. That report actually does not have a diagnosis. That report actually was introduced midway through the criminal trial, and it never found its way into evidence during the criminal trial. It's puzzling to me because it almost appears, and opposing counsel has briefed it thusly, that she's been digitally penetrated. You'll see there's a digital. That says in the history. But no one ever has discussed this. It wasn't used in the criminal trial. It's very confusing. So it's not in evidence? It was never in evidence in the criminal trial, sure. Is it in evidence for these purposes? It is because it is part of the St. Tammany Parish and DA record, which are at 82-14, and also 93-25 and 26. Okay. So, of course, the point, and I suppose malicious prosecution is judicially disfavored action for this very reason, and 611 operates for this very reason, that maybe it's okay for a parent to wait a little bit before making these types of reports. But under these circumstances, you have a parent who didn't say anything to anyone. You have three sets of mandatory reporters that have basically sort of vetted this and said, we're not going to report here. You have a parent waiting, and then when they do finally go, when they do finally say something, it's not directly to, and I see a wrap-up very briefly, it's the conflux of what Sam didn't do and then how Sam and Stephanie did it when they did it. I hate to bring this. I hate to have to be so graphic. But how did she indicate that he touched her vagina as opposed to the outer part of her private parts? In the video, it was outside. Outside. It was the skin on the outside. Okay. It was not, there was no. That's all. That's in the record at CAC in the video, which is 93. When this says digital penetration, it seems to me to have an entirely different connotation. I also, we actually had a few people look at that, and we thought that it's also possible that the exam was done digitally as well. We don't know. Okay. Like Dr. Nasser. Right. So I'm running into my rebuttal unless we have any. Nope. Thank you. Okay. Thank you, sir. Mr. Gilbert. Good morning, members of the panel. May it please the court. I guess in keeping with the de novo factual review that we've already started, if it pleases the court, I will address a few things that opposing counsel has brought up about the medical evidence. There is no proof anywhere that Stephanie Wellborn told the police that AGW began having health issues coincident with her move into Mark's home. This is something that the plaintiff has, I don't want to use the word deduced, but something less than that? Well, if all she offered the police was records dating from May or June, then that could give a misleading impression. The records did get into the police possession. They're in the district attorney's file. That showed the preexisting conditions? Yes, ma'am. Yes, Your Honor. All right. And I want to point out three reasons, and this was tied in with the legal issue over the admissibility of the police report. There are a number of reasons why, and I think, Your Honor, Judge Jones, I think you just picked up on one and implied it. These records, whatever representation there was, didn't make it into the criminal process. If you look at the probable cause affidavit, it mentions nothing about urinary tract infections or anything like that. That's not what Judge Buras issued the affidavit based on. And again, this issue of... All right, let's look at the core issue that your opponent kept kind of hearkening back to, which is he somewhat concedes that if your child says it, that's a reasonable basis to think it might have happened, okay? But he says that is overcome here, in this case, by all of the other surrounding circumstances, if you will, of the threat and the this and the waiting and everything like that. So talk to me about 611. Is there a component to 611 of my child said it, I don't know if it really happened, I'm going to sit around for a while, and then I suddenly go, ah, maybe this will help me with the custody dispute. If he confessed that that's what happened, but he still thought he didn't know one way or the other that the kid, and the kid still said it, and she's still saying it today, is that enough to satisfy 611? Candidly, I don't think so. I don't think that that's what 611 states. Well, I don't want to know what candid is. I want to know if there are cases. I don't know of any cases. That would be an abuse of 611 in my, from my standpoint. Okay, so you agree with him that if Sam had in his mind that maybe it happened, maybe it didn't, but it definitely helps him with the custody dispute, then he doesn't get 611 protection. Well, no, he just doesn't. No, I don't agree with that conclusion, because all I see is proof of subjective good faith. All I see is proof of subjective probable cause, and the trial court judges fealty to that standard. Well, I have to say that the trial judge was, I mean, and I think he was trying to apply a statute for which there is apparently little case law, but he has to explain away everything. Well, yes, they waited over two months to tell mom about it. Well, he never says a word, I believe, about the fact that she went out of state with Mark for a week at the end of July. He doesn't, you know, there are only two incidents. There's not a series of incidents. She visited her. He's not clear, it seems to me, on when this series of events allegedly began, which seems to make a big difference under the circumstances here. He has to, well, they may have been negligent, but they're still in good faith. Well, excuse me, this guy threatened to get him. And again, even that is, you know, all he can do is explain that, well, we said it was just we're going to subpoena him to court and he'd make an ass of himself. Well, excuse me, but that's still open to interpretation. Your Honor. All of those are, you know, embedded fact issues. The explanations in the reasons? In the district court opinion, correct. Correct. Those are the inferences that appellant is looking for, that appellant claims that the trial court did not afford appellant. That is the trial court explaining, okay, let's assume this. Nope. That doesn't materialize because that inference is not reasonable under any Rule 56 standard. Well, why is it not a reasonable inference when they're set? I mean, there's no question that your client Woods said, I'm going to get that blanky-blank. It's the last thing I do. There's no dispute that he said it. There's no dispute that he said it. However, there is no proof that it meant anything other than what he and his attorney say that it meant. There's no proof. Why does there have to be proof? Because on its face, it is a threat. And within less than two months, you know, this horrible accusation is made. Actually, Your Honor, I think it was well down the line. I think the utterance was in November of the year prior to the summer in which AGW says to her stepmom, I have something that I need to tell you. From that point, she never went back around Mark ever again. As soon as she told an adult. You mean AGW? AGW. As soon as she told an adult, she was removed from Mark's presence within a matter of hours. Well, but I mean, not wishing to. I mean, I understand that. I'm a mother and so on. But Woods keeps sending her back to Mark every other week during the summer, and then they go on a one-week vacation out of state before Tracy finds out about this stuff. And how could any responsible parent, you know, why wasn't she crying and screaming, I don't want to go back to that house? AGW didn't go to Tracy. AGW went to Stephanie. I understand that. But every time he kept Stephanie and Woods kept sending her back. Never. Excuse me? Your Honor, the proof is uncontested, uncontradicted, and universal and consistent that once she told Stephanie, Stephanie told Mark, Mark told AGW to tell her mom. Oh, no, you mean Sam. She told Sam. I mean Sam. AGW told her mom that night her mom slept with her. They left the house the next day. And all that occurred on July 25th? No. I mean, no, your own evidence is against that. She told Stephanie earlier in the summer, in June. Your Honor, she told Stephanie on the day that, on the same day that Tracy slept with her that night and took her out of the house the next day. Well, she was already going to the Mississippi, whatever it was, in June. He says that she went to two social, that they took AGW to two social workers in Mississippi in May or June. Is that a lie? I believe that's inaccurate. I don't believe the timing is correct. But that's the whole point. I think the record raises a dispute about this timing. His whole theory is that your client sat on this information about inappropriate touching, two instances, that he sat on it for at least a month and allowed her to keep going. That's what the district judge says. And he says they may have been negligent, but they were still in good faith. Now, you're not contradicting what the district court found, are you? I'm not contradicting that the district court allowed for the possibility of plain and favorable inferences. That's what he's supposed to do under Rule 56. But I can understand how he can, why he wouldn't, I wouldn't, why any member of this panel would say, but it doesn't matter. Because as soon as an adult became aware, she didn't go back. And there's no proof. But this is your problem. This is your problem. The court could not say, as soon as an adult became aware they had AGW tell Tracy, who then reacted immediately, I mean, you have a taped telephone conversation where Tracy says to Woods, why didn't you tell me two months ago? Now, doesn't that raise an inference that Woods had heard about this two months ago? AGW explains it in her testimony. I don't care what AGW says. I'm telling you, you're trying to, no, I think you're going on something that the district court, even the district court, was not willing to credit as a matter of law. I mean, the district court, it seems to me, very well recognized that there were anomalies in the timeline here and in the motivation of your client and in the, whether your client reacted properly and therefore was in good faith. And then the district court was saying, well, but they're still in good faith. Well, there's this problem, but they're still in good faith. And what, you know, I go back. It seems to me you have to accept that district court opinion or else you're Well, I don't necessarily, I mean, I boil the district court opinion down in my mind to the elements of the tort that they allege. When we get to questions, when we get to questions of what was the timing? If there is adequate proof of subjective, good faith, probable cause, then the probable cause element is gone. He's already lost. If there is proof of interruption of causation, intervening causation by law enforcement, their investigation, the indictment, then that element is gone and the appellate is lost. We are in a very sexualized age. And I dare say that most eight-year-olds know certain things about anatomy today because they've been told don't let somebody touch you and all that business. And you seem to be arguing that it is enough, and then we look at the court, that it is enough alone because we're not looking at post-conviction and 15 years later. We're looking at the event for the purposes of the immunity. Right. AGW goes and at some point tells Stephanie in May or June, he looked down at my panties and he touched me. Two separate occasions. And yet they wait two months to tell Tracy, and the district court finds this, in my view. Does that mean they believed AGW at that point or not? I have no way of getting in their heads. Well, and that's the problem because that opens the door, it seems to me. Because otherwise you're saying that any time a little kid says something, the person who reports immediately has immunity, and that can lead to really serious abuses. In this case. Of defendants. Sure. In this case, however, the little girl submitted to this horrific gynecological exam at eight years old. That was six months later. That's in October. This deal's in October. Correct. She told the police forensic examiner. Well, and the police didn't immediately arrest Mark. They did not. They went out and did an investigation, which is what happens when somebody makes a little or big, a 30-year-old woman claims to be assaulted or an eight-year-old claims to be assaulted, there's still an investigation. Correct. And that was done here, and ultimately charges were brought. It wasn't as if Sam was the district attorney and brought the charges himself. So the question to me is, we're really focused on whether Sam was a good father in the way he handled this, and I don't think that's the question under 611. To me, the question is, what does good faith mean? And in Parker, which is, granted, a district court opinion, but said that unless there is proof that the report was made with knowledge that the information was false or with reckless disregard whether it was false, this court must find that the report was made in good faith. So that seems to focus less on Sam's head. It does get into his head a little bit, but more on the objective question of, do we know something's false? I mean, even if I have a kid that makes up stories a lot, they could still be telling the truth on this one story. And I may really not know one way or the other, but end up going ahead and reporting it after thinking about it for a while. And so I don't, I guess I'm trying to get to what is the standard for good faith, and all of the points that Judge Jones made are answered by that, at least on the 611. If it is simply, might the guy have had a motive to want something bad to happen to Mark, then Sam loses, because of course he had a motive to want something bad to happen to Mark. But if the question is, did he know that AGW was telling a lie, I don't think we still know that. I don't think we have any evidence that she was telling a lie. The not guilty verdict is not evidence of that. So then that, to me, is the question. What is the standard for good faith, and what can you add to the Parker standard and any of the other standards that have been cited? What is the standard you're asking us to find here? I would respond to that, Your Honor, by, again, noting that this is a subjective probable cause standard, married with a good faith, presumption of good faith. I'm talking about 611, not malicious prosecution itself. I'm just saying, if we just threw out malicious prosecution and just focused on 611, what is the standard for determining good faith? Then let's vet what our daughter is saying. Let's take her to a counselor. Let's see what a professional thinks about this before we even pick up the phone and speak with any law enforcement officer. There's an audio tape where Shantarika Barnes says, look, y'all need to go to the police. This is after, I don't know, two, three months of counseling. Chief, are we going to? I'd like to hear your argument, please. I mean, go ahead. Thank you, Your Honor. I've got very little time to make it. I'm not running this, but if I were, I'd give you extra time if you've got points you want to make that you're not able to make. The point that I want to make, and I understand that the court is under all the rocks that are in the trial court's reasons, but I've scrutinized it as well, and of course my opinion doesn't matter here. I can't find any place where the judge was not absolutely faithful to the standards that he was bound to uphold. Okay, but that doesn't answer my question, which is how would you? I read from Parker the standard that the court in Parker used. Is that the standard you're advocating for good faith, or do you have a different standard? Because we don't have much from Louisiana on this. We don't have anything on this statute, and we have very little on others. I would advocate that what Stan and Stephanie actually did went above the standard for good faith. They went and they took their kid to a counselor, let the kid talk to the counselor, let the counselor evaluate the kid on a psychological level, and the result is the counselor says you all need to go to the police. You all need to take her seriously. I thought the counselor, well, again, where's that in the record? Do you have a record site? It's an audio tape. Because that's another point where there's a dispute, because they say that Shantarica, whatever her name is, Barnes, Ms. Barnes said that I am not allowed to counsel you unless you've gone to the police. That my organization doesn't allow that unless you've, is that inaccurate? That's not what Shantarica Barnes said. There's no proof of that in the record. That's just merely an allegation. Well, her notes were gone, too. That's still, it's merely just an allegation. Let me ask you, and I don't mean to harp on this point. It's okay, I want to give you an answer. Yeah, I think this good faith point is kind of important because it may be dispositive of the case. Because there is no Louisiana law on it, should we certify the question to the Louisiana Supreme Court of what good faith means? If the court is inclined to do that, I don't think that that would be unreasonable. It's certainly not what my client would have me stand up here and say. He's going to listen to this audio. He's going to say, no, end it today. Yeah, and when he listens to the audio, he's going to say, my lawyer never answered Judge Haynes' question, which is kind of important of what is, not what did Sam do, but what is the standard we articulate? When we articulate a standard in a case, we don't say what Sam does. What is a reasonable person going to do? What is a reasonable parent going to do? Okay, so it's not the Parker standard. I asked Mark in his deposition, if your daughter came up and told you this, would you believe her? After some dickering over objections, he said, yes, I would. I think that's consistent with the standard. Well, isn't that the Parker standard? I mean, are you advocating for the Parker standard or not? I think it's a good one for you. I don't know why you're fighting for it. I'm not trying to backpedal. I'm trying to apply it. I need a standard, and then I can say if Sam met it or didn't, or if there's a fact issue. Yes, I think with that. That's just me speaking for me. I can't speak for my colleagues. That is a legitimate. I need a standard. That is a legitimate standard. Okay. I think it's a good benchmark. Any time a kid makes an outcry, the custodian of the kid is in good faith under 611, and, you know, even though they're, I mean, that's it. I don't think that there's any unfettered right under the law. I don't think anything is binary. Well, then what? Well, good. I don't think any privilege is without its limits. I don't think it can be implemented unreasonably. All right. Well, you've heard what I had to say about it. All right. Thank you. Could I just ask one more? No, sir. No. We've heard enough. Is that all right with you? Yeah. Yeah, we've heard. We have your argument in brief also. Thank you. Thank you. Okay, Mr. Gilbert. I'm sorry, Lilly. Yes, Your Honor, real quick. I'm going to try. Yeah, I'll ask you then. I'm going to try. I'm going to try, Your Honor. Okay. What's wrong with the Parker standard? I believe the conduct in this case destroys. It does not. No, that's not the question. First the standard, then the conduct. Is the Parker standard a good one? The one I read, is that a good standard to use here? It's all we have to go on at this point. Okay. And then Judge Jones said, well, if the kid says, he touched me, is that enough? Is it your position, no, that's not enough? By itself, that would be enough. We have a lot of other facts in this case. So the problem here is that because Sam had a motive to harm Mark and didn't like Mark and wanted custody of this kid, then that takes away from the fact that the kid says I was inappropriately touched. No, Your Honor. The motive is over here, and that's something that's certainly consultable, but it's all of the actual affirmative actions that were taken. And here we get into what was said when the report was made. It's not, here's my daughter, she has some things to tell you. It's, here's my opinion of this. Here's the medical stuff. And when we say there's no proof that Stephanie said this, this has been an ongoing theme. It is in the gist at 18R. The St. Tammy Parish didn't talk to anyone other than Stephanie. But the question of whether she was touched. What evidence do we have that it was made with knowledge that it was false? Well, those types of facts are easily, that's inferable by the fact that you, number one, kept delivering her up. You knew about this supposed touching in June. That's beyond dispute because you've already shopped her around in Mississippi and Louisiana, and one of the reports was finished before June 1. You send her back all the way through the summer, and then when you do finally, after you have de facto custody of her to seal the deal, you make a report months later, having learned nothing in the interim. You're basically the little girl safe at this point. But I mean by your own position, he had this motive to harm Mark at the time she originally made the outcry. So if he's looking to get him, should have run out the door screaming. And instead he's taking her to counselors and he's trying to do something. So maybe he's not dad of the year here in this whole transaction, but it seems inconsistent with the argument that, look, he was out to get Mark, told him he was going to get him, but he waited to get him, and that's the reason why that's bad faith. Well, I mean, it starts to become clear when you look at the calendar, which we've argued, and he does this basically right before school starts up. Didn't they have an arrangement where she was being sent to Slidell every other week? Yes, yes, something to that nature, yes, Your Honor. So it would have been five or six visits following whenever she was sent. And it was about to be the point where AGW would go back to Slidell for the school year for good pretty much, and with periodic visits back to Sam, and that's when they slammed the door shut. J.W., the son, was already living. He had already kind of made that shift. And this is, to me, not clear, but it's more than motive because it's action as well. Sam had a motive for years before that, but it's what he did and didn't do and how he did it when he did it that matters here. Thank you, Your Honors. All right, and I just want parties to be aware that we are aware that the district court also shut the door, so to speak, on the merits of malicious prosecution, and we didn't really discuss all that, but we will get to it when we consider the case on appeal.